Andrew Cleveland ROGERS, III

v.

UNITED STATES of America.

Andrew Cleveland ROGERS, Jr.

v.

UNITED STATES of America.

Nos. 5578, 5620.

United States District Court
S. D. Ohio, E. D.
April 11, 1963.

Russell H. Volkema, Volkema, Wolske & Bopeley, Columbus, Ohio, for plaintiffs.

Joseph P. Kinneary, U. S. Atty., Southern District of Ohio, Eastern Division, Robert A. Bell, Asst. U. S. Atty., Columbus, Ohio, Robert E. Long, Department of Justice, Washington, D. C., for defendant.

BAILEY BROWN, District Judge.

These are actions brought by Andrew Cleveland Rogers III, a minor, and by his father, Andrew Cleveland Rogers, Jr., against the United States of America under the Federal Tort Claims Act (28 U.S.C.A. § 2671 et seq.)  They seek to recover damages for injuries they allege were received by young Rogers as the result of an operation performed on him at the Lockbourne Air Force Base Hospital at Columbus, Ohio.  This case was, of course, tried by the Court without a jury, and this memorandum decision is being filed in lieu of Findings of Fact and Conclusions of Law.

1

In their complaints the plaintiffs allege that on December 27, 1958, the younger Rogers was brought to the hospital for diagnosis and treatment, to which he was entitled because his father was in the military service. The complaints further allege that an appendectomy was performed as a result of which young Rogers contracted peritonitis (infection in the peritoneal cavity) which in turn caused severe, painful and permanent injuries. They sue for damages for these injuries as well as for medical and hospital expense, past and future. They rely, in their complaints, on the doctrine of *res ipsa loquitur* as well as general allegations of negligence with respect to diagnosis, preparation for and performance of the operation, and post-operative care.

In its answers, as amended, the Government denies negligence, proximate cause, and the extent of the injuries and damages and alleges that the elder Rogers was guilty of contributory negligence which would prevent his recovering. As will be seen, it will not be necessary for the Court to reach a formal conclusion with respect to contributory negligence, although, in passing, it can be said that there is no evidence to support this defense in the record. Moreover, it will not be necessary for the Court to determine whether Mr. Rogers is entitled to recover for medical and hospital expenses in the amount of $12,302 incurred by him at a private hospital even though they were paid on his behalf by the Government pursuant to a statutory right he had as a service man.

Perhaps it would be well to state at the outset the applicable principles of law, which are simple. The real problems in this case are factual and have to do with negligence and proximate cause, and, to a lesser extent, the amount of injury received.

Plaintiffs argue that under the law of Ohio they may plead both *res ipsa loquitur* and specific acts of negligence and also they may seek to prove specific acts of negligence and still rely on *res ipsa loquitur*. This is, however, another question that need not be answered because the doctrine of *res ipsa loquitur* in any event is not applicable to a mistake in diagnosis or to an unfortunate result of an operation or of post-operative care. Plaintiffs cite no cases from Ohio or elsewhere in support of their contention that the doctrine can be applied in this factual context and the Court can find none. (See, generally, 41 Am.Jur., Physicians and Surgeons, § 127, p. 236).

The case of Ewing v. Goode 78 F. 442 (C.C.S.D.Ohio 1897), frequently cited by the appellate courts of Ohio, states clearly most of the propositions of law necessary for the decision of this case. This is an opinion granting a motion for directed verdict by Circuit Judge (later Chief Justice) Taft.

Mrs. Ewing sued Dr. Goode alleging that as a result of his failure to use proper care and skill in operating on her eye and his failure to bestow proper attention and treatment upon the eye after the operation, she lost the sight of her right eye and the sight in her left eye was impaired. The Court concluded that there was not sufficient evidence to submit the case to the jury. It said, at page 443, with respect to the necessity of proving negligence and causation and with respect to the inapplicability of *res ipsa loquitur* :

"Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, establish neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to

cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

And the Court said, at page 444, with respect to the expert testimony necessary to prove negligence in a malpractice case and again with respect to the necessity of showing causation:

" * * * But when a case concerns the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury. * * * "

In the case of Kuhn v. Banker, 133 Ohio St. 304, 13 N.E.2d 242, 115 A.L.R. 292 (1938), plaintiff suffered a break in the neck of a femur and employed the defendant physician to treat her. The fracture was reduced and X-ray later showed a bony union and the parts in good position. Still later, defendant removed the splints and advised plaintiff to walk with crutches. When she tried this, she complained of intense pain and also advised defendant that the hip felt like it had not mended. Nevertheless, defendant told her this was not true and to continue to try to walk. Months later, after plaintiff had employed a second physician, X-ray showed there was then no union.

Plaintiff's second physician testified in her behalf that, subsequent to the original union of the bone, an absorption, not uncommon, had taken place at the point of union, bringing about a disunion there. He further testified that, in the exercise of ordinary skill, knowledge and diligence, the defendant physician should have taken another X-ray when plaintiff complained to him at the time she tried to walk. He further testified that, upon discovery of the disunion, proper treatment called for a remanipulation or rubbing together of the broken ends of the bone, causing a fluid to exude and the bone then reset. By the time he had an opportunity to treat plaintiff, he testified, this was no longer possible. He also testified, however, that even with a timely resetting after absorption, the chances of a union are not more than one-fourth as good as the first time and that it was improbable that there would be another union.

The trial court directed a verdict and the Supreme Court of Ohio affirmed. It held that while there was evidence that the defendant physician was guilty of negligence in not discovering the disunion and in not seeking to bring about a second union, there was no evidence from which the jury could find that this negligence was the proximate cause of the ultimate failure of the bone to be reunited.

At pages 310 and 311 of 133 Ohio St., at page 245 of 13 N.E.2d the Court quotes with approval the holding of the trial court as follows:

"Was there evidence of proximate cause which required the submission of that issue to the jury? In directing a verdict the trial court said: 'The testimony is undisputed showing that, instead of a greater probability of the fact being that the condition would not have resulted except for the negligence of the doctor, the evidence indisputably shows that the greater probability

of the truth is that it would have resulted whether the doctor had been guilty of negligence or not.' "

The case of Bowers v. Santee, 99 Ohio St. 361, 124 N.E. 238 (1919), although dealing with a statute of limitations question, describes the degree of skill and knowledge a physician must have and exercise by quoting with approval from an older Ohio case (Gillette v. Tucker, 67 Ohio St. 106, 65 N.E. 865 (1902)) as follows at page 365, of 99 Ohio St., at page 239 of 124 N.E.:

> "A surgeon and physician, employed to treat a case professionally, is under an obligation, which the law implies from the employment, to exercise the average degree of skill, care and diligence exercised by members of the same profession, practicing in the same or a similar locality, in the light of the present state of medical and surgical science; and that he will indemnify the patient against any injurious consequences which may result from his want of ordinary skill, care, and attention in the execution of his employment."

The case of Beach v. Chollett, 31 Ohio App. 8, 166 N.E. 145 (1928) tells us under what circumstances a physician must have more than an average amount of medical knowledge and exercise more than an average amount of medical skill. Plaintiff, a minor, suffered a break in the femur for which the defendant physician treated her. She charged that the reduction of the fracture was unskillfully done and her subsequent treatment was unskillful as a result of which her leg was permanently shortened. There was a jury verdict for the defendant, and plaintiff assigned error for failure of the trial court to give the following instruction, quoted at page 10, of 31 Ohio App., at page 145 of 166 N.E. of the opinion:

> "You are instructed that a physician and surgeon holding himself out as having special knowledge and skill in the treatment of a particular disease, or injury, is bound to bring to the discharge of his duty to a patient, employing him as such specialist to treat such disease, or injury, not merely the ordinary degree of care and skill possessed by general practitioners, but that special degree of care, skill and knowledge possessed by physicians and surgeons who are specialists in the treatment of such disease, or injury, in similar localities, having regard to the present state of medical and scientific knowledge at the time of treatment."

The Court held that the failure to give this charge was not error and affirmed, saying at page 11, of 31 Ohio App., at page 146 of 166 N.E.:

> "We find no error in refusing to give request No. 1. The petition does not charge that the defendant held himself out or represented himself to be a specialist in the setting of fractured limbs, but only charges that he was a duly licensed and practicing physician and surgeon, and the issues on trial did not involve determining whether he was holding himself out as having special knowledge and skill in setting fractured bones. The authorities cited by plaintiff were cases in which the issue of special skill in a particular disease or injury arose under the pleadings and was therefore directly involved. * * *"

Having determined what the Ohio law is with respect to this kind of malpractice case, and before going on to a discussion of the facts, it should be noted that plaintiffs amplified their theory of negligence in answers to interrogatories filed by the Government.

■ In these answers, plaintiffs charge that the Government physicians were negligent in making a diagnosis of appendicitis and in this connection particularly charge that they failed to perform sufficient laboratory tests in making the diagnosis.

With respect to the operation, they charge that the Government physicians

were guilty of negligence in failing to give antibiotics pre-operatively, in removing the appendix unnecessarily, and in failing to tie off the stump properly.

Post-operatively, plaintiffs charge that the Government and its physicians were guilty of negligence in lack of supervision and careful study of the symptoms of young Rogers, in not detecting peritonitis and internal hemorrhaging, in failing to use antibiotics to prevent and to treat infection, in failing to timely consult outside experts, in relying on insufficient laboratory tests and in having insufficient laboratory facilities, and in failing to keep sufficient records with respect to the condition of young Rogers.

In stating the facts of this case, the Court means thereby to indicate where the preponderance of the evidence lies. The evidence was conflicting in many respects, but to discuss all of these conflicts would make this opinion unduly long. There were approximately thirty-four witnesses, twenty-two of whom were medical witnesses.

Mr. Rogers, who was then a chief petty officer on active duty in the medical corps of the Navy but who has since retired, brought his eleven year old son to the Lockbourne Air Force Base Hospital at about 2 A.M. on December 27, 1958. They were interviewed by the duty officer, Dr. Badenhausen, who took a history to the effect that young Rogers had had recurring stomach upsets for the past four weeks and had become ill early that evening, had complained of pain in his abdomen, vomited, and had developed diarrhea. Examination by Dr. Badenhausen revealed that the patient had tenderness with rebound in the right lower quadrant of the abdomen, rectal examination was then negative, pulse was 128 per minute (elevated), temperature was 99 degrees (slightly elevated), and white blood count was 13,650 (elevated). A tentative diagnosis of appendicitis was made, and the patient was admitted to the hospital. This tentative diagnosis was not negligently made as the history, signs and symptoms pointed in that direction.

During the remainder of the night young Rogers appeared to sleep well and when he awakened later that morning he reported he felt better.

At about 8 A.M. that morning, Dr. Badenhausen was to go off duty and he then discussed the patient with Dr. Strenger, the Assistant Chief of Surgical Services. Dr. Strenger examined the patient, studied the history taken, the results of the examination on admission, the record made since admission, and ascertained that the pulse had come down from 128 to 100 (still high because 80 to 86 is normal for an eleven year old), temperature was 98.6 degrees (normal, but temperature expected to be down at this time), white blood count was 13,150 (down slightly from 13,650 but still high and within the range of laboratory error), and there was still tenderness in right lower quadrant with rebound and with guarding. Moreover, the patient now had right rectal vault tenderness (new indication). Dr. Strenger then called the parents, advised them that he intended to perform an appendectomy and learned no additional significant history. At the doctor's request, both parents came to the hospital at around 9 A.M., Mr. Rogers executed a consent to the operation, and the operation was performed shortly thereafter. The operation revealed that while the appendix was not completely sound, its condition was not such as to cause the signs and symptoms that induced the operation and therefore there was a mistake in diagnosis.

While there were factors indicating that young Rogers was improving (or in any event not getting worse) between the time of his admission and the operation, there were sufficient indications of appendicitis at the time of operation to warrant the performance of the operation. To proceed with the operation was clearly within the range of reasonable medical judgment. When appendicitis is strongly suspected, it is dangerous to delay unduly long, for to do so may allow the appendix to rupture with severe complications. As one of plain-

**6**

tiff's medical witnesses, Dr. Harmon, testified, it is much better to take out a sound appendix than it is to bury the patient with an appendix. There is a large area in which surgeons exercising reasonable judgment and skill might either operate or await further developments.

Plaintiffs contend, in connection with the mistaken diagnosis, that a second blood count was not and should have been taken for comparison prior to the operation. Plaintiffs base this contention on the absence of a chit from the laboratory showing the result of the count. It appears that such a chit normally is a part of the medical record but it also appears that physicians frequently get a telephone report from the laboratory and proceed on this information. Here the medical record did show that a second count was ordered and showed the result thereof which was slightly different from the first. The Court believes, and so finds, as heretofore indicated, that a second count was in fact taken.

Dr. Boles, a pediatric surgeon who managed the patient for months after he was removed from the Government hospital to a private hospital and who performed subsequent operations on the patient, testified that the diagnosis was negligently made because there was not sufficient evidence of appendicitis at the time of operation. However, he admitted that a few days before this trial he testified by deposition that the Government physicians were not guilty of any negligence prior to December 30th when the patient was receiving post-operative care. He testified at the trial that he had changed his mind after another review of the record.

Dr. Harmon testified in behalf of plaintiffs that negligence in the diagnosis consisted of not obtaining a sufficient history, a position from which he withdrew on cross-examination, and in failing to take a second blood count, which the Court has found was taken.

Dr. Hardie in behalf of plaintiffs testified, in general, as did Dr. Boles, that there was a negligent diagnosis because there was insufficient evidence on which to base the diagnosis of appendicitis, but, as indicated, his opinion is against the weight of the evidence.

As stated, the operation revealed that the appendix, though not completely sound, was not sufficiently unsound to cause the signs and symptoms that lead to the operation. Nevertheless, the appendix was removed and Dr. Strenger explored the peritoneal cavity for other causes of the signs and symptoms, but found none.

In connection with preparation for the operation and the operation, Dr. Hardie testified in behalf of plaintiffs that prophylactic antibiotics should have been administered pre-operatively, but all the other physicians who gave an opinion on the question including plaintiffs' witness Dr. Harmon, testified that this should not be done.

Plaintiffs offered no evidence that the appendix should not have been removed during the course of the operation; all physicians agreed it is standard practice to do so even if it is seen to be sound. Also, the great weight of the testimony was to the effect that the technique employed in performing the operation was quite satisfactory. Actually, in their brief filed subsequent to the hearing, plaintiffs do not contend that they have carried the burden of proof as to negligence in the technique in performing the operation; they merely rely in this connection on *res ipsa loquitur*, which the Court has held not to be applicable.

It was plaintiffs' main contention at the trial, in support of liability, that the Government physicians were negligent in the post-operative stage in not making a diagnosis of peritonitis and in not therefore treating the patient for this infection. The patient was removed from the Government hospital on January 1, 1959, and was treated thereafter for several months by civilian physicians at the Children's Hospital in Columbus. It will therefore be necessary, on this

branch of the case, to set out the salient facts during the patient's stay both in the Government hospital and in the Children's Hospital, for what occurred in the Children's Hospital is of the highest importance in determining the answer to the questions of negligence and causation. It does not appear, however, that it is necessary to recount the course of the patient in the Government hospital in the great detail it was presented at the trial.

On the evening of December 27th, the day of the operation, bleeding into the peritoneal cavity was suspected but the test therefor was negative. On December 28th, the patient had a relatively good day, and it certainly was not an unusual one for the day after operation. Thereafter, bowel (i. e. intestinal) sounds decreased, the patient began to run some up and down fever, there was a drop in hemoglobin, and some distension of the lower abdomen set in. There was a great deal of evidence offered by both sides (some based on records and some based on the memory of the witnesses) as to exactly when this distension began and its extent on each day. Suffice it to say that by December 30th it, together with other signs and symptoms, caused considerable concern to the Government physicians. Consultation was had with Dr. Binger, the staff pediatrician, who was brought into the case. In all, during the period from December 27th through January 1st, the patient was seen by Dr. Strenger, the operating surgeon, Dr. Talley, the chief surgeon who took over from Dr. Strenger when he went on leave, Dr. Kaplan, who had assisted in the operation, Dr. Binger, the pediatrician, Dr. Comfort and Dr. Tierney. X-rays were taken on December 31st and January 1st and possibly as early as December 30th. Due to drop in hemoglobin, indicating anemia, a transfusion was given on the night of December 30th.

On December 30th, Dr. Talley recorded the impression that the patient had some bleeding into the peritoneal cavity which was causing a paralytic ileus with subsiding gastro-enteritis. A paralytic ileus is a decrease in the contractility of the intestines, reducing their ability to carry along solid matter and gases, and thus causing an abdominal distension. Bleeding into the peritoneal cavity can cause this ileus and it also can be caused by peritonitis.

Finally, on January 1st, at the request of Mr. Rogers and with the agreement of Dr. Talley, Dr. Boles, the civilian pediatric surgeon, was called in for consultation. He examined the records and the patient and agreed with Dr. Talley that the patient had a bowel (intestinal) obstruction, reason obscure, and possibly an operation for a strangulated bowel would be necessary. Both physicians agreed that the patient should be removed to the intensive care unit at Children's Hospital.

On January 4th, Dr. Boles performed a second operation after the patient had failed to respond to conservative treatment, and his pre-operative diagnosis was: "Intraperitoneal hemorrhage with secondary ileus and possible mechanical small bowel obstruction." It should be noted here that an ileus or obstruction may be paralytic (loss of contractility of the intestine) or mechanical, such as from pressure from a fluid in the cavity. This diagnosis was, on its face, again essentially the same as that of Dr. Talley, but Dr. Boles testified that peritonitis is implicit in his diagnosis and that in any event he had it in mind as indicated by his ordering antibiotics upon admission to Children's Hospital. The operation on January 4th revealed that the patient had a severe generalized peritonitis which had caused a strangulation, or kink, in the intestine and later it was determined that septicemia (poisoning of the blood stream) had resulted.

Approximately ten days after the admission of young Rogers to Children's Hospital, the laboratory there was able to culture and identify an organism known as bacteroides, and it is conceded by all that this organism was the principal agent in the infection. This organism is

generally found in the human intestinal tract and usually, as a result of an appendectomy, invades the peritoneal cavity. This does not, however, except on very rare occasions, cause trouble, as the body is normally able to handle the organism. Cases of peritonitis and resulting septicemia wherein bacteroides is the causitive agent are rare in medical literature. It was only because of the unusually fine facilities of this hospital laboratory under the charge of an outstanding authority in this field (Dr. Wheeler) plus some good fortune that the techniques employed did result in culturing the true culprit,—bacteroides.

Bacteroides is not vulnerable to penicillin and streptomycin, which are the antibiotics normally given when peritonitis is diagnosed. After it was cultured, the physicians at Children's Hospital switched from the ineffective antibiotics which had been administered (penicillin, streptomycin and chloromycetin) to tetracycline, an antibiotic that will destroy bacteroides. This antibiotic was effective, for shortly thereafter bacteroides could no longer be cultured.

This was not, however, the end of the patient's difficulties, although he tolerated the operation well (the second one, which was the first at Children's Hospital) and improved for two weeks. Around January 18th he began to pass blood in large quantities from his rectum and a tube in his stomach. By X-ray, a diagnosis was made of ulcers in the intestine just below the stomach, and because the loss of blood was so great and could not be replaced by massive transfusion, Dr. Clatworthy, in the absence of Dr. Boles, performed a third operation. This revealed that the diagnosis was incorrect to the extent that the ulcers were actually in the stomach, and these were repaired and a tube passed from the stomach directly out through the abdominal wall.

The patient tolerated this operation well, but about the second day thereafter, he began to develop neurological difficulties manifested by convulsions, paralysis over half of his body, and by a coma or semi-coma. Although he improved from the condition, because of a possible threat to his breathing, a tracheotomy (insertion of tube in windpipe) was performed by Dr. Birck.

The patient continued to bleed into the stomach and when this grew worse and could not be controlled and transfusions were again not sufficient, still another operation was performed on the stomach on January 30th. This operation revealed the same condition as before, i. e. the stomach was filled with blood and clots. Ulcers were again repaired and a new tube was placed in another opening in the abdominal wall. At this time, as well as at the time of the first stomach operation, the patient still had a generalized peritonitis.

Young Rogers was in very poor condition during the second month at Children's Hospital, and his central nervous system continued to create problems.

In the third month, his improvement was general but he developed a jaundice which was thought by Dr. Boles to be a serum hepatitis caused by the transfusions. Also, during this month the patient developed hemianopia or absence of vision to the right side.

In addition to all his other difficulties, it appeared that young Rogers developed abscesses on his extremities, from which staphylococcus was cultured. This was apparently contracted at Children's Hospital.

Dr. Boles rendered a final opinion to the effect that bacteroides peritonitis was probably the major single factor in initiating this lengthy and complex illness. This would account, he thought, for the septicemia and ileus, both paralytic and mechanical. He believed it difficult to account for the severe attack of ulcers and internal hemorrhage. He thought that the infection with periods of hypotension probably caused clots in the blood vessels as well as small areas of bleeding around blood vessels which in turn probably caused the brain and central nervous system symptoms.

Dr. Sayers, a neurosurgeon who was called into the case at Children's Hospital, was of the opinion that young Rogers has substantial brain damage which is permanent. This appears to be the only permanent injury young Rogers has, although it is a serious one. It was his opinion that this damage was caused by blood stream infection in turn caused by peritoneal infection.

The Government offered proof of an alleged pre-existing brain and central nervous system disorder in support of a contention that the residual disability is not altogether of recent origin. This proof, however, failed to establish any nexus between a prior condition and the present disability. The most that can be said is that this prior condition may have added to the diagnostic problems at the Government hospital.

It is plaintiffs' contention that they have proven by the preponderance of the evidence that all or at least some of the illness and residual disability suffered by young Rogers subsequent to his transfer to Children's Hospital were caused by a bacteroides peritonitis contracted before he left the Government hospital. Even if this contention be accepted it is obvious that to fix liability on the Government it must be shown (1) that its physicians were negligent in failing to diagnose the peritonitis and (2) this failure to diagnose peritonitis was a proximate cause of the subsequent harm. (We have already determined that the Government physicians were not negligent in the diagnosis of appendicitis, and that the invasion of the peritoneal cavity by bacteroides was not due to their negligence.)

Dr. Harmon and Dr. Boles did support plaintiffs' contention that there was negligence in the failure to diagnose peritonitis, but the weight of the evidence is to the contrary. (Dr. Harmon did not give an opinion as to when it should have been diagnosed, and Dr. Boles testified it should have been by December 30th.) Certainly, the diagnosis of ileus, which was made by the Government physicians, was a reasonable medical judgment under the circumstances.

But even if we assume that there was negligence here, it appears that the only significant step that should have been taken, but not taken, to combat peritonitis is the administering of antibiotics. And in the exercise of ordinary skill the antibiotics that would be given are penicillin and streptomycin, neither of which would have been of any value in combating bacteroides. Plaintiffs offered no evidence that in the exercise of ordinary skill tetracycline would be given upon such a diagnosis, and this is the only antibiotic that is effective against bacteroides. Bacteroides was not cultured until ten days after young Rogers was transferred to Children's Hospital. Even if we assume, though it would by no means necessarily follow, that if peritonitis had been diagnosed at the Government hospital by December 30th the culturing of the bacteroides would have been advanced to January 8th, it would be impossible to say to what extent the illness and residual disability would have been decreased. What we have here, then, is a situation in which, even if we assume that a diagnosis of peritonitis had been made when it should have been made, there is no evidence that this would have changed the course of events. Plaintiffs, therefore, have not carried the burden of proof that negligence in the failure to diagnose peritonitis was a proximate cause of the injuries and damages for which they sue.

To recapitulate, plaintiffs have failed to carry the burden of proof as to negligence in the diagnosis of and in operating for appendicitis. They also have failed to carry the burden of proof as to negligence in allowing the peritoneal cavity to be invaded with bacteroides. Lastly, they have not carried the burden as to negligence in failing to diagnose peritonitis or that such negligence, if established, was a proximate cause of the injuries and damages for which they sue.

It results that a judgment must be entered for the defendant.