Andrew Cleveland ROGERS, III and Andrew Cleveland Rogers, Jr., Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 15424.

United States Court of Appeals Sixth Circuit.

July 24, 1964.

Russell H. Volkema, of Volkema, Wolske & Bopeley, Columbus, Ohio, for appellants.

Robert Long, Civil Division, Dept. of Justice, Washington, D. C., John W. Douglas, Asst. Atty. Gen., Morton Hollander, Irvin M. Gottlieb and Robert E. Long, Attys., Dept. of Justice, Washington, D. C., and Joseph P. Kinneary, U. S. Atty., Columbus, Ohio, on the brief for appellee.

Before PHILLIPS and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Andrew Cleveland Rogers, Jr. and his son, Andrew Cleveland Rogers, III, a minor, aged eleven, acting through his next friend, brought suit against the United States under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), claiming damages to the minor, caused by malpractice of government doctors in rendering medical service to the boy, when, at 2 A. M. on December 27, 1958, he was brought to the Lockbourne Air Force Base Hospital at Columbus, Ohio, and underwent a surgical operation and was also rendered post-operative care. The boy's father, Andrew Cleveland Rogers, Jr. was at the time in military service, and he and the members of his family were entitled to medical care at the Lockbourne hospital. The suits were joined for trial and are appealed as one case. Plaintiffs-appellants will hereafter be referred to as "plaintiffs," and defendant-appellee, as "defendant".

Prior to the time the boy was admitted to the hospital, he had periodically complained of abdominal pain for approximately four weeks, and, on the day before he was admitted, he had diarrhea, complained of pain in the lower abdomen, became nauseated, and vomited. The boy was examined in the early hours of the morning of December 27, 1958, by the medical officer at the hospital. The examination disclosed that he had tenderness with rebound in the right lower quadrant of his abdomen, an elevated pulse—128 per minute, an elevated white blood count—13,650, and a slightly elevated temperature—99°. At 8 A. M., on December 27, the boy was seen by Dr. Lawrence Strenger, a surgeon, who obtained a history from the boy and reviewed the case with the medical officer who had examined the boy on his admission to the hospital. Dr. Strenger then conducted a complete physical examination, finding location of pain with rebound tenderness in the right lower quadrant, and tenderness in the right rectal vault. The boy's temperature was somewhat lower than the admission reading, but the white blood count was still elevated and not significantly lower than at the time of admission.

After talking with the boy's parents with regard to his history, it was Dr. Strenger's decision that the child probably had acute appendicitis, and both parents of the child executed a consent to an appendectomy. There was an abundance of proof by distinguished physicians and surgeons that the signs, symptoms, and history of the child pointed to a diagnosis of appendicitis. Shortly after Dr. Strenger's conclusion that the boy had acute appendicitis, and after the parents had executed a consent to an appendectomy, the operation was performed.

The operation disclosed that the boy's appendix was not completely sound, but that he had not been suffering from appendicitis. The boy's post-operative course was not unusual in any respect and gave no cause for alarm until the afternoon of December 30, the third post-

operative day. At this time the child developed complications which were a source of concern to the government physicians. Five of them examined the boy and reviewed the medical record. As a result of their consultations, it was their impression that the boy had some bleeding into the peritoneal cavity which was causing paralytic ileus—a failure of the contractibility of the intestines—with a resulting reduction of the ability of the intestines to pass along gas and solid matter, and subsiding gastroenteritis.

On January 1, the boy's condition deteriorated, and a civilian pediatric consultant, Dr. Thomas Boles, from the Children's Hospital at Columbus, Ohio, was summoned for consultation. Dr. Boles examined the records and the patient, and agreed that the boy probably had an obstructed bowel. Dr. Boles and Dr. Thomas Talley, a government physician, agreed that the boy's condition warranted their transferring him to the intensive care unit of the Children's Hospital for closer observation.

On January 4, Dr. Boles performed an exploratory operation. His pre-operative diagnosis was essentially the same that the government doctors had made on December 30, to the effect that the child was suffering from intraperitoneal hemorrhage with secondary ileus and possible mechanical small bowel obstruction. The operation performed by Dr. Boles on January 4 revealed that the child then had severe generalized peritonitis, which had caused a strangulation, or kink, in the intestine. Ten days after the boy's removal to Children's Hospital, the hospital laboratory expert bacteriologist was able to culture and identify the pathogenic organism-bacteroides—as the principal agent in the child's infection. This organism is generally found in the human intestinal tract and usually, as a result of an appendectomy, invades the peritoneal cavity. This does not, except on very rare occasions, cause trouble, as the body is normally able to handle the organism. Cases of peritonitis and resulting septicemia, wherein bacteroides is the causative agent, are rare in medical literature, and it appears that it was only because of the unusually fine facilities of the laboratory of the Children's Hospital, under the charge of an outstanding authority in this field, Dr. Wheeler, in addition to some good fortune, that the techniques employed resulted in culturing the true culprit—bacteroides, as so well expressed by Judge Bailey Brown in his opinion in the determination of this case.

The foregoing does not constitute the entire history of the child's misfortunes. About January 18, he began to pass blood in large quantities from his rectum, and a tube was inserted in his stomach. An X-ray diagnosis was made of ulcers in his intestine just below the stomach. Dr. Clatworthy, in the Children's Hospital, then performed a third operation. This revealed that the diagnosis was incorrect to the extent that the ulcers were actually in the stomach, and these were repaired and a tube passed from the stomach directly out through the abdominal wall. The boy tolerated this operation fairly well, but about the second day thereafter he began to develop neurological difficulties, manifested by convulsions, paralysis over half of his body, and by a coma or semi-coma. Although he improved from this condition, a tube was inserted in his windpipe because of a possible threat to his breathing. The boy continued to bleed into the stomach, and when this grew worse and could not be controlled and transfusions were not sufficient, another operation was performed on his stomach on January 30, and revealed that the stomach was filled with blood and clots. Ulcers were again repaired, and a new tube was placed in another opening in the abdominal wall. At this time, as well as at the time of the first stomach operation, the patient still had a generalized peritonitis. He was in very poor condition during the second month at the Children's Hospital, and his central nervous system continued to create problems. In the third month at the hospital, his improvement was general, but he developed a jaundice which was thought by

Dr. Boles to be a serum hepatitis caused by the transfusions. Also, he developed an absence of vision to the right side. In addition to all of his other difficulties, the boy developed abscesses on his extremities, from which staphylococcus was cultured.

The result of all of the foregoing is that the child now had a grotesquely scarred body, is retarded to the extent that he cannot attend school, and is in need of permanent medical care and guidance.

In their complaint and on the trial, plaintiffs contended that the doctors at the government hospital, to which the boy was first admitted, were guilty of both pre-operative negligence and post-operative negligence, resulting in the boy's present condition. The alleged pre-operative negligence was in failing to give antibiotics before the operation; removing the appendix unnecessarily, and in failing to tie off the stub properly. The alleged post-operative negligence was the failure of government doctors to make a diagnosis of peritonitis, and their failure to administer antibiotics at the time they discovered that the boy was not suffering from appendicitis.

The case was tried before the District Court without a jury, and the court found that plaintiffs did not sustain the burden of proof as to negligence, and that even if the alleged negligence were established, there was no proof that it was the proximate cause of the injuries and damages for which they sued.

As to the District Court's finding that even if the alleged negligence were established there was no proof that it was the proximate cause of the injury suffered by the boy, a further observation should be made.

With regard to proximate cause, the District Court evidently had in mind the plaintiffs' claim that the government doctors were negligent in not administering antibiotics to the boy, pre-operatively and post-operatively. As to pre-operative administration of antibiotics in this case, all physicians, other than plaintiffs'

witness, Dr. Hardie, testified that antibiotics should not have been administered before the operation; and plaintiffs' witness, Dr. Harmon, agreed with the government physicians on this aspect of the case. As to post-operative administration of antibiotics and the failure of the government physicians to diagnose peritonitis, the testimony adduced on behalf of the Government was to the effect that the boy, while at the government hospital, did not appear to have the signs that "we would expect to go along with peritonitis." Dr. Boles of Children's Hospital, however, testified that he diagnosed peritonitis and prescribed the administration of antibiotics, upon the admission of the boy to Children's Hospital; and the antibiotics, so prescribed, were penicillin, streptomycin, and chloromycetin. These antibiotics were administered during a period of ten days after the admission of the boy to Children's Hospital, until it was found that his condition was due to a rare causative agent, as hereafter appears, for which the above-named antibiotics, which would be administered in the ordinary course of medical skill to combat peritonitis, were wholly ineffective; and, subsequently, another antibiotic, which, in the ordinary exercise of medical skill, would not be used for peritonitis, was administered, resulting in the disappearance of the causative agent of the infection.

■ Since administration of penicillin, streptomycin, and chloromycetin, in the ordinary course of medical skill, to combat peritonitis, would have been completely ineffective, if they had been used by the government physicians during the last three days during which the boy was at the government hospital—the period upon which the claimed negligence is based—and prior to the boy's admission to Children's Hospital; and, since such antibiotics were administered for ten days after his admission to Children's Hospital before they were found ineffective, the wrong diagnosis as to peritonitis, and the failure of the government physicians to administer penicillin, streptomycin, and chloromycetin, while the

boy was at the government hospital, could not be considered to be the proximate cause of the child's injury, since these antibiotics, in any event, would have been found wholly ineffective against the causative agent of the peritonitis in this case.

On appeal, in their reply brief, plaintiffs concede that they did not prove that the operation by the government doctors was negligently performed. Plaintiffs say they do not concede, however, that there was no negligence in this area, but "only that they were unable to prove it." The plaintiffs also concede that they did not prove post-operative negligence by clear and convincing proof, or by the manifest weight of evidence, from the time of surgery through December 29, 1958. Plaintiffs now rest their claim upon the alleged negligence of the Government "from the morning of December 30 until the child was transferred to Children's Hospital during the late afternoon of January 1, 1959." These concessions on the part of plaintiffs removed from the case much of their argument, even in their reply brief, which is directed to claimed negligence on the part of the government surgeon in performing the operation—in relation to which they now concede that they were not able to prove negligence.

Plaintiffs complain that the government doctors were negligent in not administering antibiotics to the child for peritonitis from the morning of December 30, 1958, until the late afternoon of January 1, 1959. However, as the trial court found, the evidence clearly showed that it was impossible to say that anything the government doctors could have done on December 30, 1958, including the administration of broad-spectrum antibiotics, would have altered the child's future medical course, or decreased, or obviated the residual disability attributable to this rare and unusual bacterial infection; and there was substantial evidence to support this finding. The antibiotics administered to the child when he was removed to Children's Hospital were penicillin, streptomycin, and chloro-

mycetin. These are the antibiotics that would be administered in the course of ordinary medical skill and practice to combat peritonitis. But these are of no avail in infection by bacteroides, which can be destroyed only by tetracycline.

The court found that there was no negligence on the part of the government doctors in performing the operation, and in their post-operative care of the patient; and that their conduct was in keeping with the exercise of reasonable medical judgment and medical practice, under the circumstances of this unusual case. In all probability, the peritonitis and resulting septicemia, wherein bacteroides was the causative agent—a situation rarely to be found in medical literature—resulted in all of the ills and sufferings to which the child was subjected —the bleeding into the peritoneal cavity, causing paralytic ileus with subsiding gastroenteritis; the passage of blood from the rectum; the ulcers, as well as the clots in the stomach; the convulsions and paralysis; the staphylococcus abscesses; the damage to the central nervous system; and, as a result of the blood transfusions, hepatitis.

There were thirty-four witnesses in the case, of whom twenty-two were medical witnesses. As has been said, conflicting medical opinion in medical malpractice cases is the rule rather than the exception; and it is for the trial court to choose from among the competing and conflicting inferences and conclusions that which it deems most reasonable. An examination of the record is convincing that the judgment entered by the District Court in favor of the government was not clearly erroneous. Moreover, it was sustained by the evidence.

As to the question of missing records, and the arguments adduced therefrom by counsel for plaintiffs, no presumption can be drawn unless it is clearly shown that the evidence was wilfully withheld; and it appears that, if, in this case, the missing records in question, consisting of X-rays and reports thereon, had been available at the trial, they would have been, in the light of testimony, devoid of

## 936

probative value on the issue whether there were clear signs of peritonitis present on December 30 and 31, 1958, which was the only pertinent point involved in the controversy about the records.

On the question of application of the rule of res ipsa loquitur, there was no error in the holding of the trial court.

In accordance with the foregoing, the judgment of the District Court is affirmed upon the opinion of Judge Bailey Brown, which is adopted by this court and which is reported in Rogers v. United States, D.C., 216 F.Supp. 1 (1963).