BRADSHAW, APPELLANT, *v.* WILSON, APPELLEE.

(No. 4404—Decided January 9, 1950.)

*Mr. J. W. Starritt,* for appellant.
*Messrs. Shumaker, Loop, Kendrick & Winn,* for appellee.

CARPENTER, J. This appeal on questions of law brings to this court for review a judgment for the defendant entered on a verdict returned on the direction of the court at the close of the plaintiff's evidence. The action is one for damages alleged to have resulted to plaintiff from the malpractice of the defendant, a specialist in orthopedic surgery.

On June 19, 1946, plaintiff sustained a spiral comminuted fracture of the humerus of her right arm just above the elbow. The next day she employed defendant to "reduce the fracture and to attend her during her convalescence."

The specifications of negligence on the part of defendant as charged in the amended petition may be grouped into two classes:

(1) Failure to properly reduce the fracture; and (2) permitting it to become infected and otherwise failing to take proper care of it during the period of convalescence.

The answer admits defendant's employment, denies negligence and alleges that plaintiff left the hospital, where defendant was attending her, without his con-

sent and signed a document releasing him from any responsibility for any complications that might arise.

From the evidence it appears that plaintiff's injury occurred on the night of June 19, 1946; that the next day she was received as a patient at Mercy Hospital, Toledo; and that, on the advice of her physician, defendant was employed to reduce the fracture and attend her. After an X-ray was made, defendant proceeded to reduce the fracture by an open operation, placing two screws in the broken bones and a cast upon the arm. The next day another X-ray was made.

Shortly after this, infection developed in the wound and defendant cut a hole in the cast in the area of the operation to enable the wound to drain and to be treated. A sinus drainage also developed. At that time defendant told plaintiff that her arm was getting along "all right."

Plaintiff testified that, after about a month and while the wound was still draining, defendant permitted her to go to her home, but, under his directions, she went to his office where he continued to dress the wound. He then told her to go to the outpatient clinic of Mercy Hospital where she went daily for two weeks, and when defendant returned from a vacation she returned to the hospital as a patient where she stayed another month under the care of defendant and his assistant. The wound in her arm was still draining.

On August 24, 1946, another X-ray was taken at the hospital. A resident surgeon at the hospital, who attended her under Dr. Wilson's direction, testified that a separation of the fractured parts of the bone was shown by this X-ray. All the X-rays which were taken are in evidence as exhibits, and the August 24th one shows obviously the separation of the bones as described by that surgeon.

On October 23, 1946, another X-ray was taken which

the same witness testified showed one of the screws to be loose and a loose fragment of bone which he said "not having a good blood supply, became necrotic but not infection; but it is draining." He also said that such pieces of bone frequently have to be removed by surgical operation.

At this juncture in the trial a serious error in evidence occurred. On direct examination this physician, defendant's assistant, was asked the question:

"Now state whether or not in September or October, 1946, from your examination, from what you had observed and from your experience in the army and your private experience, whether or not it was your opinion that an operation was necessary?"

Objection by the defendant to this was sustained, and the offer to prove was:

"If the witness had been allowed to answer the question he would have testified that in his opinion an operation was necessary."

This was prejudicial error, especially in the light of what took place later in the treatment of plaintiff.

In the course of the trial, objections were sustained to numerous other questions on direct examination, which seem to this court to have been proper, but, as no offers to prove were made, prejudice to plaintiff does not appear.

After the second month in the hospital under Dr. Wilson's care, she was again permitted to go home but returned to the outpatient clinic where defendant's assistant dressed the arm. During that time the loose screw came out into the dressing, and on November 11, 1946, another X-ray was taken at Mercy Hospital, which plainly shows but one screw in the bones and separation of the parts of the bone; at least shows that there was no union of the parts of the humerus.

The evidence tends to show that through all this de-

fendant was in charge and directed the care given the plaintiff, and that the sinus drainage was due to the loose fragment of bone which could be seen in the X-rays. Plaintiff testified that she suffered severe pain in her arm and hand during all this time.

On November 25, 1946, plaintiff was transferred to Maumee Valley Hospital. The defendant's assistant said that this was done "as an economic factor."

With this change, a new period in the treatment of plaintiff's arm began. Two other physicians, both orthopedic surgeons, took over her case. They took X-rays, which showed them that no union of the bone had taken place and the wound was still draining. She was given frequent doses of penicillin and sulfa-mereigine until December 12, 1946, when the surgeons operated upon the arm. One of them testified that the purpose of the operation was to remove "a piece of dead bone and a screw from the area of the fracture * * *, it was an isolated screw, not holding anything. Therefore it was removed." This was the second screw which had been put into the bone by defendant on June 20, 1946, when he reduced the fracture.

In February 1947 another operation was performed by these surgeons and one of them testified, describing what was done:

"* * * to bone-graft the fracture, repair the radial nerve * * * a plate with four screws was applied, with same bone graft lying alongside the bone and with the bone ends of the fracture squared off, placed in apposition."

After these operations, the drainage stopped, and in a month plaintiff was able to use her arm.

The foregoing summary of the evidence is that most favorable to the plaintiff. The familiar rule for trial courts to follow on a motion to direct a verdict is restated in the syllabus of the recent case of *Purdy*,

*Admr.,* v. *Kerentoff,* 152 Ohio St., 391, 89 N. E. (2d), 565. Whether such motion should be sustained "depends upon the evidence and reasonable inferences therefrom treated in the light most favorable to plaintiff."

Referring to the two groups of the errors assigned, on number one, that the reduction operation was negligently done, it can well be said that no witness testified to support this technical proposition and, if plaintiff's cause depended upon that contention, the judgment would have to be affirmed.

On the charges of neglect and lack of due care during the period of convalescence, the above summary of the evidence indicates that it tended to prove that Dr. Wilson had plaintiff under his care from June 20 to November 25, 1946, a period of five months. From the first there was drainage from the wound and he dressed it constantly during that whole period. From the testimony of defendant's assistant it seems that this resulted from infection which may have been cleared up by the antibiotic treatment he administered, but the sinus drainage which was due to the dead piece of bone continued until plaintiff went to the Maumee Valley Hospital. It was also said that an operation was necessary to remove the dead bone. This was done later by the other surgeons.

One of the screws which was put into the bone by defendant came out of the arm of its own accord and later the other screw was removed because "it was an isolated screw, not holding anything."

During all this time defendant did nothing to correct this worsening condition, of the presence of which his own X-rays informed him. From all this the jury could well have inferred neglect on the part of the defendant.

In addition to this, there is the further evidence that, when plaintiff was transferred to the other hospital

and the other doctors took over the case, they were able to clean up the arm and in a few weeks after their treatments and operations were completed she could use her arm. That this could be done gave rise to the obvious inference of neglect in what had not been done by the defendant. *Richeson* v. *Roebber,* 349 Mo., 132, 159 S. W. (2d), 658, 141 A. L. R., 1.

At page 12 in the annotation of the A. L. R. report of the above-cited case there are assembled citations of numerous cases holding that expert testimony is not always necessary to prove malpractice. In *Francis* v. *Brooks,* 24 Ohio App., 136, 156 N. E., 609, this court sustained a judgment which was not supported by expert testimony. The defendant there was a dentist.

It is urged that there is no evidence that anything defendant did or did not do proximately caused plaintiff's damages. That might be true if her damages were limited to the ultimate shortening of her arm and the limitation in its use she finally experienced. But what about the pain and suffering she endured during the five months Dr. Wilson had charge of her case? If it can be inferred that he was negligent in any respects in his treatment, it may also be inferred that her pain and suffering were caused by that neglect. These questions were for the jury, and as the record stood at the close of plaintiff's evidence they should have been so submitted. For this error, and the error in evidence noted above, the judgment is reversed and the cause remanded for a new trial.

*Judgment reversed and cause remanded.*

CONN and FESS, JJ., concur.