**EDWARDS, Plaintiff, v. WIGGINS, Defendant.**

Common Pleas Court, Cuyahoga County.

No. 623295.   Decided March 27, 1953.

Richard B. Kay, Henry S. Golland, Cleveland, for plaintiff.
R. Crawford Morris, Arter, Hadden, Wykof & Van Duzer, Cleveland, for defendant.

## OPINION

By THOMAS, J.

Plaintiff's motion for new trial challenges the correctness of the verdict directed in favor of the defendant at the end of plaintiff's case.

The motion requires a re-examination of the controlling question of whether the plaintiff presented sufficient evidence to state a cause of action under her petition.

Plaintiff asserts in her petition that:

"on or about September 26, 1950 and continuously therefrom until on or about October 18, 1950 said defendant in his capacity as a practicing physician attended and treated said plaintiff during her pregnancy, until plaintiff passed the fetus by a miscarriage on October 11, 1950; and until said defendant gave plaintiff a release so that she might go for further treatments at the clinic of the University Hospitals in Cleveland, Ohio, on or about October 18, 1950."

Plaintiff further says that defendant was negligent:

"in that after becoming aware of plaintiff's condition prior to and immediately after the fetus was passed, that he wholly and entirely failed to take any steps or prescribe or give any treatment or treatments to allay or correct the subsequent infection of the sexual organs."

Plaintiff further says that the defendant was further negligent:

"in that after knowing said plaintiff was suffering from her pregnancy and subsequent miscarriage; and that after knowing of the infection and that the sexual organs of said plaintiff were endangered thereby; that he nevertheless wrongfully and negligently concealed said fact, whereby said plaintiff and her family were prevented from having and from knowing the necessity of the great care and attention which said plaintiff's physical condition then demanded and required."

Plaintiff further says:

"that had the defendant made known the true physical condition at the time her condition became known to said defendant and had the defendant given said plaintiff during the times aforesaid, the hospital and medical care and attention which her condition then required, the pain and suffering and the possibility of sterility which has resulted from said negligence would not have occurred."

In condensed language these allegations of plaintiff's petition charge that her sexual organs became infected following a miscarriage, that the defendant knew of the infection, but that he nevertheless (a) failed to take any steps to prescribe

or give any treatment to allay or correct the infection, (b) failed to give her the hospital and medical care and attention required, and (c) concealed knowledge of said infection from the plaintiff and her family.

Now does the evidence support these claims? A composite of the evidence most favorable to the plaintiff's case (and which principally came from the plaintiff and her husband) tends to establish the following facts.

Plaintiff first consulted defendant doctor, a general practitioner, at his office on or about September 23, 1950. She informed him that she had missed her last two menstrual periods, felt weak and nauseated. The defendant took her blood pressure and gave her a tonic prescription of di calcium phosphate which she had filled and used.

On September 30th he saw her again in his office. She had been spotting. She was weak and anemic. Defendant ordered her to stay off her feet. He told her she needed rest and if not careful she might go into T. B. He diagnosed pregnancy.

On October 3rd the defendant was called to plaintiff's home, was told she was still bleeding and was suffering pains. The defendant took her temperature and pulse, told her to stay off her feet, and prescribed sulpha which she obtained and started taking.

On October 7th the defendant was informed by telephone that the plaintiff had passed a small clot and his attendance was requested. After a second phone call he responded, arriving about 11 A. M. He took her temperature, her pulse, and pressed her stomach.

At nine in the evening of October 9th the defendant was called and told that the plaintiff had passed several clots. He was asked to come to see her and did. While there he took her temperature, and found that she had a slight fever. According to the plaintiff and her husband he told her that he was afraid she might lose her baby, to look for it in any discharge and explained that it would look like a sac.

On October 10th the defendant was notified by telephone that the plaintiff was having severe pains. He said that there was no reason to come to see the plaintiff unless she was flooding.

The next day, October 11th, the plaintiff had more cramps followed by passage of a sac. When the defendant was informed by telephone he is quoted as saying that the sac should be flushed down the toilet. The defendant was further informed that the plaintiff was in pain and was bleeding. He did not come to see her.

On October 12th the defendant was again informed by tele-

phone that she was in pain and was asked to come to see her. The defendant stated that there was no reason to come if the plaintiff was not flooding.

The defendant was not called again until October 17th when he was notified that the plaintiff had a high fever and was still bleeding. Further he was told that the drugstore refused to refill the prescription (presumably the sulpha prescription). The doctor thereupon called the drugstore and either ordered a refill or gave a new prescription.

On October 18th the defendant was informed that the plaintiff's fever was higher and he was asked to come to see her. He did. He gave the plaintiff a shot of penicillin and when he stated that the cost would be $15.00 he was told by the plaintiff's husband that they could not afford to pay that much for treatments. He was asked if his wife could be admitted to a hospital and he said he thought she could. He gave her a slip to present to University Hospitals which read:

"This patient has an elevation of 101.2 following a spontaneous abortion. She is hereby referred to the hospital for adequate attention and advice."

On October 19th she presented herself to the out patient department of University Hospitals who referred her to the gynecology department, where she gave a medical history which in part follows. The abbreviations and symbols have been spelled out.

". . . Perfectly well till three weeks ago when she began to have cramps and increase in bleeding—8 days ago profuse bleeding and fetus and placenta were passed—placenta appeared complete. No bleeding since then except when patient on feet to bathroom etc. Has been in bed since. Fever started last week (about Monday 10-9-50) grew worse yesterday and was seen by local medical doctor who treated with penicillin intramuscularly. . ."

She was admitted to the hospital the same day where she gave a similar medical history part of which follows. The abbreviations and symbols have been spelled out.

". . . had an uneventful pregnancy up until about 10/11/50—when she began to have vaginal bleeding—followed by lower abdominal cramps—then passed fetus and after birth at home on 10/11/50. Was treated at home by local medical doctor for bleeding and abortion. Patient has bled very little since the abortion was completed. Patient began to get feverish four days ago but no chills and treated with one shot of penicillin on 10/18/50 by local medical doctor and then referred by local doctor to clinic."

A physical examination in the gynecological department on

the 19th day of October revealed that her temperature was only slightly elevated (37 degrees centigrade or 99.2 fahrenheit); that the cervix was soft, that there was some ulceration around the os; that the uterus was enlarged and soft; and that there was no bleeding.

The impression of the examining doctor was that she had an infected, incomplete abortion.

The plaintiff was scheduled for surgery on the 20th of October but on the evening preceding she developed a fever of 39 degrees centigrade (102.2 fahrenheit) and the operation was cancelled. She was started on penicillin but when the temperature failed to respond she was given aureomycin. To this new treatment she responded well and on October 26th a dilatation and curettage (D & C) of her uterus was performed. She was discharged from the hospital on the second post operative day without symptom or fever. The laboratory diagnosed the 15 cc endometrial curettings (scrapings of her uterus lining) as an infected incomplete abortion.

It has been noted that each of the plaintiff's claims of negligence is premised upon the contention that the plaintiff's sexual organs were infected, knowledge of which infection the defendant is claimed to have had.

Thus it is essential to each of the plaintiff's claims of negligence to show that subsequent to her spontaneous abortion on October 11, 1950, and before the defendant ceased treating her on October 18, 1950 her sexual organs were infected to the knowledge of the defendant.

The direct evidence reveals that the infected condition of her uterus was first tentatively diagnosed on October 19, 1950 when she was examined in the gynecology department at University Hospitals. At that time the examining doctor noted on the hospital record "impression, infected incomplete abortion." On October 26th following her D & C operation the pathological examination of the curettings surgically removed from her uterus established that she had been suffering from an infected incomplete abortion. But the record contains no direct evidence that infection pre-existed October 19, 1950, to the knowledge of the defendant.

In the absence of direct evidence was there any circumstantial evidence to this effect?

There were previous symptoms of illness. These included a slight fever on October 9th (two days before the spontaneous abortion) but no serious fever until October 17th; cramps on the 10th and 11th of October preceding and accompanying the abortion and some pain thereafter on the 12th; profuse bleeding on the 11th, the day of the spontaneous abortion but only a little bleeding afterwards.

Isolating and tagging the origin and cause of such symptoms would require special information and training not within the common knowledge and experience of laymen.

Accordingly the jury could not be granted the option of inferring from those symptoms that to the knowledge of the defendant the plaintiff prior to October 19th while under the defendant's care was suffering from an infected incomplete abortion.

Missing therefore is the foundation upon which the plaintiff rests each claim of negligence contained in her petition. For the record contains no direct evidence and does not circumstantially justify the conclusion as plaintiff claims that the plaintiff's sexual organs were infected, while defendant was treating her and within his knowledge.

Further as to each of the other elements of the three claims of negligence appearing in plaintiff's petition there is a failure of proof.

Thus no evidence was offered that good medical practice required the defendant to prescribe any medicines which he failed to give, or required him to hospitalize the plaintiff sooner, or required him to disclose information to the plaintiff or her family which he did not reveal.

Hence it must be concluded that the allegations of negligence in the plaintiff's petition are not supported by the evidence.

Actually, however, the plaintiff in the trial of her case altered her underlying claim that she was suffering from infection in her sexual organs with defendant's knowledge.

Instead the plaintiff took the position during her trial, and now takes the position on her motion for new trial that the defendant's negligence consisted not in his knowledge of any infected condition, but rather in his failure, by vaginal examination or otherwise, to discover the presence of her incomplete abortion.

Thus in her motion for new trial the plaintiff says that the "specific acts of negligence of the defendant were as follows:

"1. The omission by defendant of the necessary examination of the vagina, in order to determine if the abortion had been complete; constitutes an act of negligence.

"2. The omission by the defendant to come to see his patient who was in ill health and in a weak condition when he was called on numerous occasions by plaintiff's husband, after plaintiff had expelled from her body a sac, later identified as fetus; constitutes an act of negligence.

"3. Even after it was discovered by the defendant, that

plaintiff had a high fever a week after the incomplete abortion, he still neglected and omitted to make the proper examination."

Necessarily the plaintiff's right to a new trial depends on whether the claims of negligence appearing in the petition are supported by evidence. Since, however, the claims of negligence set forth in plaintiff's motion for new trial actually were relied on by the plaintiff during the trial without objection by the defendant, it seems prudent even if not essential to examine them in light of the evidence to see if these substituted claims of negligence are supported.

It is claimed that the defendant was negligent in failing to make a vaginal examination.

But the short answer to this claim must be that there is no evidence in this record to the effect that good medical practice required the defendant to make a vaginal examination following a spontaneous abortion.

With reference to the second and third claims of negligence recited in her motion for new trial, it is relevant to note that the defendant was first notified of the plaintiff's increase in fever on October 17th. The next day October 18th when the defendant was told that the fever had gone higher he went to see her, gave her a shot of penicillin and gave her a written authorization to University Hospitals.

No direct evidence was offered which showed that his course of conduct was less than the standard of skill and care required of the defendant.

And here again it cannot be said that the claimed "want of skill or lack of care is so apparent as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it." **Modrzynski v. Lust, 55 Abs 106.** Expert testimony was necessary to establish the negligent character, if any, of defendant's conduct in this respect. None was offered.

In sum it is determined that neither the claims of negligence in the petition nor the different claims of negligence set forth in plaintiff's motion for new trial and asserted at the trial have been supported by sufficient evidence to warrant submitting the issue of defendant's alleged negligence to the jury.

Furthermore it does not appear that on this record the jury would have been entitled to find that the plaintiff suffered any actionable injury or damage.

It is true that if a patient suffers pain in a prolonged convalescence because the treatment accorded the patient is less than ordinarily prudent the physician becomes legally accountable. **Bradshaw v. Wilson, 87 Oh Ap 319.**

But if the length or extent of convalscence is only shown to be POSSIBLY due to the doctor failing to exercise ordinary prudence or to conform to good medical practice any associated pain or suffering cannot be regarded as the proximate result of such negligence.

This essential distinction between the probability and possibility of proximate connection was recognized by our Supreme Court in **Kuhn v. Banker, 133 Oh St 304.**

There the evidence permitted a finding that the defendant surgeon was negligent in failing to x-ray the neck of a femur after some union had occurred but before allowing the patient to bear weight on the hip. But the evidence failed to disclose the probability that the subsequent ununited fracture resulted from such negligence.

The significant evidence consisted of several questions put to Dr. Stern, an orthopedic surgeon, called as plaintiff's witness.

Recross Examination.

"Q. (By Mr. Nesbitt) You used the word 'possibility.' Of course, if there had been an absorption of this callus of this bone by nature, there would be very much probability after that of any uniting of that bone by any natural process, would there?

"A. Not much probability.

"Q. There would be very little probability, would that be true?

"A. It would be enough that I would think warranted in trying it.

"Q. Would you say to the jury had that been done, that the probabilities are that this condition that you found would not have resulted and the work that you were required to do, would not have had to be performed?

"A. No, I can't say that."

This is undoubtedly the evidence that prompted Judge Williams to say in his opinion that "Loss of CHANCE of recovery, standing alone, is not an injury from which damages will flow." (Emphasis added.)

Applying the principle of the Kuhn case, to require submitting to the jury the issue of an actionable injury it was necessary that the evidence directly or circumstantially justify reasonable men in concluding that it was more probable than not that the plaintiff's pain and discomfort subsequent to the occurrence of her spontaneous abortion proximately flowed from the claimed acts of defendant's negligence.

It seems sufficient to say that this record does not contain the evidence which would permit reasonable men to reach such a conclusion.

A thorough re-examination of the issues raised by the motion for new trial convinces the court that it did not err in directing a verdict for the defendant. Plaintiff's motion for new trial therefore is overruled.