James **FINLEY**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**No. C66–474.**

United States District Court,
N. D. Ohio, E. D.

July 2, 1970.

Ramon Basie, Cleveland Ohio, for plaintiff.

Robert B. Krupansky, U. S. Atty., Donald N. Jaffe, Asst. U. S. Atty., Cleveland, Ohio, Gerald D. Freed, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

BEN C. GREEN, District Judge:

This is an action under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. The basis of the plaintiff's claim is alleged malpractice on the part of certain physicians employed by the Veterans Administration.

This action is novel in that it arises from a total depigmentation of the plaintiff, a Negro. Photographs introduced into evidence reflect that prior to the events set forth in plaintiff's complaint, his skin and hair were dark brown in color and he was normal in appearance, and that at the present time, his skin and hair have turned completely white.

In May, 1964, the plaintiff, James Finley, was employed by the United States at the Veterans Administration Hospital in Cleveland, Ohio. As such an employee, he was entitled to some free medical consultation and treatment. He is also an honorably discharged veteran from the United States Air Force. He is classified as having a service-connected disability, a peptic ulcer, for which he is entitled to treatment at government facilities.

On May 27, 1964, the plaintiff appeared at the outpatient department of the Veterans Administration Regional Office in downtown Cleveland. This was a separate facility from the hospital where he was employed. At that time he advised the consulting physician, Dr. A. J. Roitano, that he was out of the medication which he took for his ulcer, and required an additional supply.

Mr. Finley testified that he advised Dr. Roitano that he was having difficulty sleeping, and requested some medication to help him in that regard. He stated that Dr. Roitano inquired of him as to whether he had previously taken

any sleeping pills, and he advised the doctor he had. Mr. Finley described the pill to Dr. Roitano as a white split tablet with the inscription "CIBA" on it. A prescription was then given to Mr. Finley by Dr. Roitano, which he had filled in the pharmacy section of the Regional Office. The prescription called for a sleeping tablet commonly known as Doriden, which medication corresponded to the description of the tablet Mr. Finley advised Dr. Roitano he had previously taken. Plaintiff testified that he recognized the Doriden tablets as similar to sleeping pills he had taken as a patient in the Veterans Hospital. As of that date plaintiff had been a patient, at the Veterans Hospital on three previous occasions, primarily for treatment of his ulcer.

Mr. Finley testified that he immediately began taking both the ulcer medication and one of the sleeping tablets each evening, and about a week thereafter, he noticed a skin disorder, manifesting itself in the form of small bumps or a rash, beginning to appear on his arm. This disorder caused an itching sensation, and produced some discomfort.

Plaintiff further testified that when this itching rash appeared, he stopped in to the office of Dr. Marcel Greenberg, a physician in the admitting office of the outpatient department of the Veterans Administration Hospital, and showed him his arm. He alleges that Dr. Greenberg looked at his arm, told him that it appeared to be a heat rash, and did not prescribe any treatment or medication.

Plaintiff contends that a few days later he again went to the outpatient admitting office at the hospital, as the rash had continued to increase in severity and was spreading to other parts of his body. He testified that on that occasion he saw Dr. Emil H. Adler, also a staff physician, and told him of his previous visit to Dr. Greenberg. He alleges that Dr. Adler examined the rash, expressed the opinion that it was probably a heat rash, or the measles, and took no further action on his complaints.

The evidence is in conflict on these two alleged consultations by the plaintiff with Dr. Greenberg and Dr. Adler. Each of the doctors denied seeing Mr. Finley on the occasions alleged and denied the statements attributed to them.

The Veterans Hospital provided a medical clinic for its employees for temporary treatment of medical ailments. The clinic was open from 8:00 to 9:30 a. m. and from 3:00 to 4:00 p. m. Plaintiff does not claim that he consulted with either Dr. Greenberg or Dr. Adler during regular clinic hours. He claimed that while he was on other errands in the hospital he stopped in their office.

In support of his contention that he had consulted with Dr. Greenberg, Mr. Finley produced a witness who had been a fellow employee. The witness testified that he had accompanied Mr. Finley to the outpatient office on the date he claimed to have seen Dr. Greenberg. There was a minor discrepancy between the testimony of the witness and Mr. Finley regarding this event; the witness testifying the visit took place around the lunch hour and they returned to work, whereas the plaintiff testified that it was around his time to go home.

In support of the contention that the plaintiff did not see the two physicians as alleged, the defendant introduced evidence that every employee at the hospital had an employee health card maintained for him, and that any employee requesting temporary treatment would have a notation of the treatment recorded on the card. There were no entries by either doctor on plaintiff's health record for the dates in question. Evidence was also introduced to show that a veteran requesting treatment was required to fill out a 10P10 application form, which requirement would have applied to the plaintiff. There was no evidence that such an application for treatment on the dates in question had been made.

In addition, Dr. Greenberg testified that if he had observed a patient with what appeared to be a skin disorder, he

would refer such a patient for a dermatological examination, and that such action would be noted on the health record. Dr. Adler testified that he would not have advised a patient that a skin disorder on the arm was either heat rash or measles, in that measles manifested itself in another fashion.

For reasons which will appear hereinafter, the Court does not believe that it is essential to resolve this conflict. However, the Court is of the opinion that it would be difficult to find from a preponderance of the evidence that the plaintiff did consult with Dr. Greenberg and Dr. Adler, as he contends.

By the evening of June 15, 1964, the plaintiff's rash had become so widespread, and the discomfort so severe, that the plaintiff's wife called her physician, a Dr. Welsh, to see her husband. Dr. Welsh examined Mr. Finley, and expressed the opinion that he was suffering from a drug reaction. He advised the plaintiff to terminate the continued use of Doriden, and to seek treatment at a private hospital the following day.

The plaintiff did as he was advised, but, due to circumstances not pertinent to this action, was unable to secure treatment or admission at the private hospital. He then proceeded to the Veterans Administration Hospital, where he was employed, and went to the admitting office. He consulted with a Dr. Baker who was on duty there and was referred by him to Dr. Anatol Glen, another physician with the Veterans Administration, for a dermatological examination.

On June 17, 1964, Dr. Glen examined Mr. Finley, and the clinical record reflects the doctor's impression of his condition as "drug eruption." He advised the plaintiff to discontinue the taking of all drugs, prescribed some medication and conservative home treatment to relieve the itching sensation, and placed Mr. Finley on one week sick leave.

In response to a request by Mr. Finley that he be hospitalized, Dr. Glen advised the plaintiff that, at that time, the hospital was in the process of moving from its existing location, and that only emergency cases were being admitted. He did not consider plaintiff sick enough to be admitted at that time, but if his condition did not improve he would be admitted to the hospital at the new location.

Plaintiff's skin condition did not improve and he was admitted to the Veterans Administration Hospital on June 29, 1964. He remained hospitalized until July 15, 1964. During his hospitalization, his condition appeared to improve, and upon his discharge there appeared to be no change in plaintiff's skin color and no change in his physical appearance.

The record of plaintiff's hospitalization, under the signature of Dr. H. Rotman, in the category of "Established Clinical Diagnosis" states as one of the conclusions, "Dermatitis medicamentosa, possibly due to Doriden." In Dr. Rotman's final summary the same diagnosis of dermatitis medicamentosa is contained. Under diagnosis, that condition is referred to as "probably secondary to Doriden," whereas under impression it is stated as "possibly due to Doriden."

Entries by both Dr. Rotman and Dr. Glen on Mr. Finley's clinical records and medical records during the term of his hospitalization also express the opinion that the patient was suffering from a dermatitis medicamentosa possibly related to a drug reaction from the taking of Doriden. The records also reflected an anemic condition on blood serum testing, as to which the resident physician in hematology stated that "this anemia could possibly be related to Doriden intake, although I am unaware of this side effect."

Within a few weeks after his discharge from the hospital, the plaintiff experienced another form of skin disorder. His skin coloration began to lighten, and all hair on his head and body fell out. The skin continued to lose its dark color over a period of a few weeks until all pigmentation was gone, and as his hair grew back in, it was white in color.

The exact period during which these changes occurred is not clearly established. However, Mr. Finley's medical history at the Veterans Administration Hospital contains a reference to a consultation on August 6, 1964 at which, at least, the onset of the condition was noted, and a consultation of September 17, 1964 at which it was noted that:

> Patient is a tall, slender man whose skin is quite light except for some areas on his hands which retain his usual pigmentation. He wears a cap to cover his gray hair and the still present areas of alopecia about which he is quite sensitive.

There was not a substantial difference between the medical opinions of the parties' expert witnesses regarding the plaintiff's physical problems. It appears to the Court that their testimony varied in matters of semantics, and not substance.

Dr. John A. Kenney, Jr., head of the Dermatology Department of Howard Medical School, appeared as the plaintiff's expert. Dr. Aaron V. Lerner, Professor of Medicine in charge of the Dermatology Unit at Yale Medical School, appeared for the defense. Each of these eminent dermatologists stated, in essence, that in his opinion Mr. Finley initially suffered a drug reaction from the Doriden manifesting itself in the form of a dermatitis condition, that he suffered an exfoliative dermatitis, and that thereafter he sustained a total depigmentation of skin and hair.

The testimony of the two experts differed in their designations of the plaintiff's depigmentation. Dr. Kenney referred to it as leukoderma, whereas Dr. Lerner classified it as vitiligo. It appears to the Court, however, that those two terms, rather than signifying two different dermatological disorders, reflect the difference in opinion of the doctors of the causal relationship of the drug reaction to the later depigmentation.

The term "leukoderma," as defined by Dr. Kenney, means a depigmentation for which the cause is known. He stated that, in his opinion, the cause of Mr. Finley's problem was known. He testified that the taking of Doriden caused the initial drug reaction, the drug reaction caused the exfoliative dermatitis, and the exfoliative dermatitis caused the depigmentation. He acknowledged that complete depigmentation, such as that sustained by plaintiff, is not an uncommon phenomenon, that it can be caused by many things, and that there are cases where the cause is unknown. However, in the circumstances of Mr. Finley's case, he was of the opinion that the depigmentation could be said, to a reasonable medical certainty, to be causally related to the taking of Doriden.

The term "vitiligo," on the other hand, as defined by Dr. Kenney, means a depigmentation for which the cause is not known.

Dr. Lerner testified that, in his opinion, the cause of Mr. Finley's condition was not known. He stated that there are many possible causes for a total depigmentation and that it could not be said with any medical certainty that the taking of Doriden by Mr. Finley was the cause of his condition. He testified that many persons have a predisposition to vitiligo, and that a physical or emotional trauma can trigger the latent disorder. He stated that the history which he had of Mr. Finley reflected an emotional nature that would lend itself to the activation of a latent vitiligo condition. However, a report prepared by Dr. Lerner, admitted into evidence, recognizes a possible relationship between the taking of Doriden and vitiligo. The report, in part, states:

> The question is: Did the extensive dermatitis, which is presumably due to Doriden relate in any way to hair loss and to vitiligo? I believe the relationship, if one exists, would be indirect. That is, the patient would have an exfoliative dermatitis because of an allergic reaction to Doriden. The dermatitis, in turn, could have predisposed him to develop vitiligo and hair loss at the particular time he did. Or-

dinarily, a patient predisposed to vitiligo requires little in the way of trauma to the skin to have loss of pigment. If the patient was a potential candidate for vitiligo the generalized dermatitis would certainly be sufficient trauma for development of total vitiligo.

I do not believe that Doriden has a direct effect on the pigment cells. In fact, no one has ever reported that any drug can produce vitiligo. One has been sought for but not yet found.

That analysis is consistent with Dr. Lerner's testimony, wherein he admitted the possibility, but not probability, of a relationship between the plaintiff's taking of Doriden and his later depigmentation.

There were matters on which Dr. Kenney and Dr. Lerner were in specific agreement.

First, and foremost, they agreed that the Doriden could not have been the direct cause of the plaintiff's depigmentation. They each stated that, although much research has been aimed at developing one, there is no known drug that can directly cause a pigment loss.

The doctors agreed that total depigmentation, whether it be labelled leukoderma or vitiligo, may result from a number of causes.

The doctors also agreed that a person without a predisposition to vitiligo was unlikely to suffer total depigmentation, and that a person so disposed may suffer a loss of pigmentation as a consequence of any trauma to his skin, including any drug reaction, producing a dermatitis condition.

The testimony of both of the doctors also indicated that if Mr. Finley's taking of Doriden did produce a drug reaction, such reaction, and any consequent effects thereof, would have been diminished in severity if the Doriden had been withdrawn at some point soon after he began its use.

· There is a further item of evidence in the record on this question of causal relationship. In 1965 Mr. Finley sought an increase in his disability benefits based on his depigmentation. That application was denied, on the basis that the condition was not service connected. However, two dermatologists for the Veterans Administration who examined the plaintiff concluded that:

He has a generalized depigmentation of the entire body and a complete vitiligo of the hair. His eye color remains dark brown. From the history, which is well documented we can conclude that the drug reaction from Doriden has led to his present condition.

Based on all the foregoing, it is the Court's conclusion that, while there is no known drug which can cause a total loss of pigmentation, the plaintiff's taking of Doriden, although not in and of itself the direct cause of the plaintiff's leukoderma, produced in Mr. Finley a drug reaction, the drug reaction manifested itself in the form of severe exfoliative dermatitis, and the severe exfoliative dermatitis was such a trauma to the plaintiff's system that it triggered a latent predisposition to total depigmentation. Therefore, the taking of the Doriden by the plaintiff was the proximate cause, as that term is understood in the law, of his depigmentation.

Defendant contended in final argument that assuming the foregoing to be true, the government would not be liable in that it was not reasonably foreseeable that the taking of Doriden would finally result in total depigmentation. The evidence does indicate that this may well be the first recorded instance of leukoderma related to the taking of Doriden, and that it is considered rare for an exfoliated dermatitis to cause total depigmentation.

However, it is basic law that for liability to attach the exact injury need not have been foreseen. If the defendant was guilty of negligence, and the risk of some injury was reasonably foreseeable from the negligent conduct, then there is liability.

In this action there was evidence that Doriden was known to the medical profession, and listed in the Physician's

Desk Reference, as possibly producing skin rash as a side effect. There was, therefore, some risk of physical reaction attached to the use of Doriden of which the Veterans Administration physicians should have been aware. The fact that the reaction on this particular plaintiff was far more severe than could have reasonably been anticipated is not controlling.

This then leads to consideration of the critical question of whether there has been proof of malpractice on the part of any of the Veterans Administration physicians herein.

Plaintiff's specifications of negligence, in substance, are as follows:

1) That Dr. Glen was negligent in failing to have the plaintiff admitted to Veterans Administration Hospital on June 17, 1964.

2) That Dr. Greenberg and Dr. Adler were each negligent in failing to properly diagnose the plaintiff's skin condition, take a medical history from the plaintiff which would have revealed his use of Doriden, and withdraw the plaintiff from Doriden at that time.

3) That Dr. Roitano, the dispensing physician, was negligent in prescribing Doriden for the plaintiff.

There are certain principles of law applicable to malpractice actions generally, which must be considered in evaluating the plaintiff's contentions.

 In a malpractice case, the burden rests upon the plaintiff to prove negligence by a preponderance of the evidence. There is no presumption of negligence arising from the fact that a bad or unexpected result occurs. On the contrary, there is a presumption, which must be overcome by the plaintiff, that the medical services were performed in an ordinary skilled manner. Starr v. Fregosi, 370 F.2d 15 (CA 5, 1966); Watson v. United States, 346 F.2d 52 (CA 5, 1965); Thompson v. Lillehei, 273 F.2d 376 (CA 8, 1959); Nardini v. Gilbert, 260 F.2d 177 (CA 4, 1958); Wall v. Brim, 138 F.2d 478 (CA 5, 1943);

Christopher v. United States, 237 F. Supp. 787 (D.C.E.D.Pa., 1965); Pearce v. United States, 236 F.Supp. 431 (D.C. U.D.Okl., 1964); Bruce v. United States, 167 F.Supp. 579 (D.C.S.D.Cal., 1958); 41 Am.Jur., Physicians and Surgeons, §§ 125–127.

 In evaluating the conduct of a physician charged with malpractice, the test is whether the physician in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care, and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care, and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care, and diligence exercised by members of the same medical community in similar situations. 41 Am.Jur., Physicians and Surgeons, § 82; 42 O.Jur.2d, Physicians and Surgeons, § 113.

The burden of proof carried by a plaintiff has been defined by the United States Supreme Court as follows:

Proof of malpractice, in effect, requires two evidentiary steps: evidence as to the recognized standards of the medical community in the particular kind of case, and a showing that the physician in question negligently departed from this standard in his treatment of plaintiff. Davis v. Virginian Railway Co., 361 U.S. 354, 357, 80 S.Ct. 387, 389, 4 L.Ed.2d 366 (1960).

██ Failure to establish the recognized standards of the medical community is fatal to the presentation of a prima facie case of malpractice by the plaintiff. Davis v. Virginian Railway Co., supra, at p. 358, 80 S.Ct. 387; Morgan v. Schlanger, 374 F.2d 235 (CA 4, 1967); Brandon v. Art Centre Hospital, 366 F. 2d 369 (CA 6, 1966); Riley v. Layton, 329 F.2d 53 (CA 10, 1964); George v. Travelers Insurance Co., 215 F.Supp.

340 (D.C.E.D.La., 1963) aff'd. 328 F.2d 430 (CA 5, 1964).

It is generally held that proof of the recognized standards must be provided through expert testimony. Morgan v. Schlanger, supra; Starr v. Fregosi, supra; Brandon v. Art Centre Hospital, supra; Watson v. United States, supra; Riley v. Layton, supra; Brown v. Keaveny, 117 U.S.App.D.C. 117, 326 F.2d 660 (1963); Thompson v. Lillehei, supra; Nardini v. Gilbert, supra; Ayers v. Parry, 192 F.2d 181 (CA 3, 1951); Wall v. Brim, supra; Peterson v. Carter, 182 F.Supp. 393 (D.C.W.D.Wis., 1960); 41 Am.Jur., Physicians and Surgeons, § 129; 81 A.L.R.2d 590, 601.

There is an exception to this rule, which recognizes that expert medical testimony is not necessary in those cases where the physician's negligence has been so gross as to be within the comprehension of laymen, and requires only common knowledge and experience to understand it. Washington Hospital Center v. Butler, 127 U.S.App.D.C. 379, 384 F.2d 331 (1967); Brandon v. Art Centre Hospital, supra; 41 Am.Jur., Physicians and Surgeons, § 129; 81 A. L.R.2d 591, 608. This exception, however, is generally confined to questions of negligence in administration of proper medical procedures, and not applied where questions as to diagnosis or treatment are concerned. 81 A.L.R.2d 591, 594, 612–616. Thus, it was held in Quick v. Thurston, 110 U.S.App.D.C. 169, 290 F.2d 360, 363 (1961) that:

> * * * where the question turns on the merits and the performance of scientific treatment, the issue may not be resolved by the jury without the aid of expert opinion.

Similarly, in Ayers v. Parry, supra, 192 F.2d at p. 185, the court stated that:

> * * * where, as here, an injury to healthy tissue within the region of treatment constitutes an occurrence beyond the realm of laymen, the issue of negligence with respect to that injury must be determined by expert testimony.

In a Federal Tort Claims action, the court applies the law of the forum in malpractice actions. Watson v. United States, supra; Christopher v. United States, supra; Bruce v. United States, supra.

It appears to the Court that the controlling Ohio law on malpractice actions is in accord with the general principles hereinbefore set forth. 42 O.Jur.2d, Physicians and Surgeons, §§ 150, 152, 157, 158.

In 1897 Circuit Judge William H. Taft (later Chief Justice of the United States Supreme Court) wrote as follows in interpreting the Ohio law on malpractice, Ewing v. Goode, 78 F. 442 (Cir. Ct.,S.D., Ohio):

> Before the plaintiff can recover she must show by affirmative evidence— first, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. at p. 443
>
> * * * * * *
>
> When a case concerns the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence to be submitted to the jury. at p. 444

The continuing validity of Ewing v. Goode as an accurate statement of Ohio law was recognized by Judge Bailey Brown, sitting by designation in the Southern District of Ohio, in Rogers v. United States, 216 F.Supp. 1 (D.C.S.D. Ohio, 1963), aff'd. 334 F.2d 931 (CA 6, 1964).

The Sixth Circuit Court of Appeals has, in another context, spoken of "the virtual necessity of expert testimony in medical malpractice cases," L'Orange v.

Medical Protective Co., 394 F.2d 57, 61 (CA 6, 1968).

Analysis of some Ohio decisions does indicate a rather liberal application of the exception to the expert testimony rule, although the orthodox rule is recognized as the controlling legal principle.

In Hubach v. Cole, 133 Ohio St. 137, 12 N.E.2d 283 (1938), the court had under review the dismissal, entered at the close of the plaintiff's case, of a malpractice action, wherein the issue was whether the plaintiff suffered from a congenital skin disorder or had sustained radium burn during the course of medical treatment. The syllabus of the decision reads:

> In a malpractice action against a physician, involving a claim of negligent treatment with injurious results, it is reversible error to arrest the evidence in chief and render judgment for the defendant physician, where, viewing plaintiff's evidence in the light most favorable to her contention, he has presented a chain of circumstances and events from which an inference may reasonably arise that the physician was negligent and that such negligence was the proximate cause of an impaired physical condition.

In the course of the opinion the court stated:

> In a malpractice action, the issue is whether the defendant physician has proceeded in the treatment of the particular case with the requisite standard of care and skill is a matter which must ordinarily be determined from the testimony of medical experts. But the statements and acts of the defendant physician, as well as external appearances and manifest conditions which are observable by anyone, may be given by non-expert witnesses. And such testimony by lay witnesses may show a course of conduct with ensuing results of such a character to warrant the inference of want of care. id, p. 142, 12 N.E.2d p. 286.

It is the Court's opinion that this rather broad language of the Ohio Supreme Court must be viewed in the light of the facts before that court.

From the court's opinion, it appears that, on cross-examination, the defendant physician admitted that it would be "inadvisable" to give treatments of the kind he had been administering to the plaintiff oftener than three weeks apart, and that in the plaintiff's case three months should have intervened between treatments. The plaintiff's medical witness testified that she had sustained a radium burn as a consequence of the treatments following too closely to each other. The defendant physician testified that the treatments were in fact three months apart. Lay witnesses appearing for the plaintiff testified that the treatments were only two weeks apart.

It thus appears that there was positive evidence in the record, introduced through the testimony of medical witnesses, as to the proper standards to be applied in the administration of the treatment which the defendant had been affording the plaintiff. The testimony of the lay witnesses was in proof of the physician's failure to follow the proper medical practices. Those same witnesses also testified as to the changes in the plaintiff's skin condition following the treatments, allegedly administered too close together.

It is worth noting that one of the authorities cited by the Ohio Supreme Court in support of the quoted language set forth hereinabove was the decision of the Michigan Supreme Court in De Groot v. Winter, 265 Mich. 274, 251 N. W. 425. The Sixth Circuit Court of Appeals, in construing Michigan law, has made it quite clear that Michigan is considered a state wherein expert testimony is an absolute prerequisite as to proof of those matters of "special knowledge strictly involving professional skill and attention, unskillfulness, negligence or failure to do that which ought to be

done." Brandon v. Art Centre Hospital, 366 F.2d 369, 370–372 (CA 6, 1966). That view of controlling Michigan law is derived from rulings of the Michigan Supreme Court in Lince v. Monson, 363 Mich. 135, 108 N.W.2d 845 and Zoterell v. Repp, 187 Mich. 319, 153 N.W. 692. Lince v. Monson restricts the exceptions to the expert testimony rule to those instances "where the lack of professional care is so manifest that it would be within the common knowledge and experience of the ordinary layman that the conduct was careless and not conformable to the standards of professional practice and care employed in the community," 363 Mich. 135, 141, 108 N.W.2d 845, 848.

Viewed in the light of its facts, and the other considerations set forth herein, Hubach v. Cole is not a significant departure from the general rules pertaining to malpractice actions.

However, certain subsequent rulings of lower Ohio courts appear to apply the holding of the Supreme Court decision in a manner somewhat beyond the confines of the weight of authority in permitting malpractice actions to go to verdict in the absence of expert testimony. While reciting the rule that expert testimony is generally necessary in malpractice actions, those decisions have broadly applied the Ohio Supreme Court's language regarding the uses of lay evidence in the absence of expert testimony. Evangelista v. Black, 97 Ohio App. 390, 126 N.E.2d 71 (1953); Bradshaw v. Wilson, 87 Ohio App. 319, 94 N.E.2d 706 (1950); Wiley v. Wharton, 68 Ohio App. 345, 41 N.E.2d 255 (1941). See also, Francis v. Brooks, 24 Ohio App. 137, 156 N.E. 609 (1926).

There are, on the other hand, a number of recent holdings by Ohio courts pertaining to proof of malpractice which apply the expert testimony rule in a strict manner. Rush v. Akron General Hosp., Ohio App., 171 N.E.2d 378, 84 O.L.A. 292, 295 (App., 1957), M.C.O. OS No. 35496, 3–12–58; Modrzynski v. Lust, 88 N.E.2d 76, 55 O.L.A. 106 (App., 1949); Edwards v. Wiggins, Ohio Com. Pl., 114 N.E.2d 504, 65 O.L.A. 292 (C.P., 1953). See also, Urdang v. Drs. Mahrer etc., Ohio App., 158 N.E.2d 902, 81 O.L.A. 23 (App., 1959).

Assuming that these two lines of authority represent somewhat divergent interpretations of Hubach v. Cole and the necessity for expert testimony in malpractice cases, this Court believes that those decisions applying a strict interpretation of the expert testimony rule represent the better view.

■ Applying the rules of law which this Court finds controlling herein to the facts as established by the trial evidence, the Court has come to the conclusion that the plaintiff has failed to prove by a preponderance of the evidence, malpractice on the part of the government physicians. Although the expert testimony of the plaintiff's medical witness is sufficient to support a finding of proximate cause, there is no proof that the Veterans Administration doctors, whom plaintiff is alleged to have consulted, departed from recognized medical standards in their dealings with the plaintiff.

Taking plaintiff's theories of negligence in order, the first contention relates to the failure of Dr. Glen to admit Mr. Finley to the hospital on June 17, 1964.

■ This clearly involves a question of diagnosis, a technical and specialized subject matter on which expert testimony is necessary to establish a standard of proper conduct. The question presented to Dr. Glen at that time was whether the plaintiff's condition was of sufficient severity to warrant his hospitalization under the unusual circumstances then prevailing at the hospital. This Court cannot speculate that Dr. Glen's actions were negligent, without some proof on the point.

Further, the plaintiff's medical expert testified that while in his opinion hospi-

talization might have helped, it would only be a guess, and that indications for hospitalization differ from doctor to doctor. He did not express the opinion that Dr. Glen had failed to follow proper medical standards in declining the plaintiff's request for hospitalization on June 17, 1964.

There was no expert evidence that an emergency situation existed which would have called for plaintiff's immediate admission to the hospital on June 17, 1964.

There was also no proof that the failure of Mr. Finley to secure hospitalization at that time was proximately related to his total depigmentation, as Dr. Glen did withdraw the plaintiff from Doriden when he first saw him.

It therefore follows that plaintiff has failed to prove malpractice on the part of Dr. Glen.

The next allegations of negligence pertain to the actions of Dr. Greenberg and Dr. Adler, which may be considered together by virtue of the similarity.

Assuming for the purposes of this discussion that Mr. Finley did see each of those physicians, there is no evidence that their conduct did not conform to recognized medical standards. It appears that the allegations made against them involve mistakes of judgment in diagnosis of the condition which the plaintiff exhibited, an area which requires expert testimony to prove. This Court cannot say, relying on common knowledge and experience, that those doctors should have recognized the plaintiff's condition in a manner other than that attributed to them, and have responded in any different fashion.

In the absence of evidence to the contrary, there is a presumption in law in favor of the conclusion that these doctors exercised due care under the circumstances, and, therefore, it cannot be found that they were guilty of negligence.

The final allegation of negligence is plaintiff's contention that Dr. Roitano was negligent in prescribing Doriden for Mr. Finley.

By the plaintiff's own testimony, Dr. Roitano prescribed the Doriden in response to the plaintiff's description of a sleeping pill he had previously taken. The evidence does not disclose that the plaintiff indicated to Dr. Roitano that he had suffered any adverse effects from such medication.

The evidence is not sufficient to support a finding that Dr. Roitano was negligent in the dispensing of a well-known and commonly used sleeping pill under these circumstances. In the absence of expert evidence indicating that proper medical standards were not followed in prescribing a common medication in response to a patient's description of a previously used drug, the Court cannot find from a preponderance of the evidence that the plaintiff has proved malpractice in this regard. This is not a situation where common knowledge and experience leads to the conclusion that the physician acted improperly.

The plaintiff also contends that Dr. Roitano was negligent in failing to warn Mr. Finley of the fact that a known side-effect of Doriden was possible skin rash.

While there is evidence that Doriden is known to produce skin rash, there is no proof as to the incidence of such side-effect in relation to the use of the drug. If it appeared from the evidence that there was an abnormally high proportion of skin disorder reaction to the use of Doriden, the Court might be in a position to conclude, applying common knowledge and experience, that a warning was called for. However, from common knowledge and experience the Court is aware of the fact that many drugs do carry warnings of possible side-effects in their descriptive literature, even though the possibility of such reaction occurring is remote. There is testimony in this record that aspirin, the

most common of medications, can cause side-effects in some cases. This Court cannot formulate an independent judgment as to whether proper medical standards require the giving of a cautionary instruction whenever a physician prescribes a common medication with some known side-effect. In the absence of expert evidence that some cautionary advice should have been given Mr. Finley at the time Dr. Roitano prescribed the Doriden, the Court cannot find negligence in that regard. This is particularly so in view of the plaintiff's representations to Dr. Roitano regarding his prior use of a sleeping tablet corresponding to that given him.

Finally, plaintiff contends that Dr. Roitano was guilty of negligence in failing to check the plaintiff's medical records before prescribing Doriden, in that he would have discovered that Mr. Finley had had a previous allergic reaction to the drug. The evidence does not sustain the plaintiff's contention in this regard.

The plaintiff testified that on one of his prior hospitalizations, he had been given Doriden to help him sleep, and that he suffered an itching skin reaction on his legs. He stated that he believed it was on his second or third hospitalization, and identified the hospital personnel who were involved as Dr. Donaldson and Nurse Mary Baumgard.

The clinical records indicate that Dr. Donaldson treated the plaintiff only on the occasion of his first hospitalization in 1958-1959. The only reference in the clinical records to Mary Baumgard also appears in that hospitalization, for the dates February 20, 1959 and February 22, 1959.

There is nothing in the record of that first hospitalization indicating that Mr. Finley received any Doriden. The nursing notes and medication records do disclose that on different dates, he received Seconal, Nembutal and Demerol, each of which is a general type of tranquilizing or sleeping medication.

The only entries on the nursing notes by Nurse Baumgard on the two dates as set forth above related to complaints by Mr. Finley of a cough, and contain no mention of any medication to aid in sleeping.

Dr. Donaldson's summary for that hospitalization, under the category of "skin" states "normal."

The itching episode which plaintiff related is reflected in the clinical records of his third hospitalization in 1963. On nursing notes of March 12, 1963, appears the entry, made by Nurse Maryada Ferguson, "pt. complaining of a rash and itching of legs." That complaint is also reflected in the nursing notes of March 13 and March 14, 1963, neither of which carries the signature of Mary Baumgard. The plaintiff's physician at that time was Dr. D. McClelland. The records do not indicate any participation by Dr. Donaldson in Mr. Finley's care in 1963.

Of more significance, however, than the personnel concerned, is the fact that the 1963 records do not reflect the prescription of any Doriden for the plaintiff. The records indicate that he may have received Seconal or Nembutal after the onset of the itching condition, but do not reflect any such medication prior thereto.

In Dr. McClelland's admitting notes the entry appears "no allergies." In a record prepared subsequent to Mr. Finley's discharge, Dr. McClelland noted under "allergic reactions" that "patient occasionally develops a mild pruritic erythematous rash as a result of using soaps," and under the category of "skin" noted "occasional erythematous, pruritic rash after washing with certain soaps. No other history of dermatitis etc."

The Court has examined plaintiff's complete clinical records, which contain the record of all his hospitalizations and treatment at government facilities. The Court has found no reference recorded therein to prior dispensation of Doriden by government doctors to the plaintiff.

From the evidence, it appears that if Dr. Roitano had checked Mr. Finley's prior medical records he would have

found that Mr. Finley's statement that he had previously taken Doriden was not corroborated therein; that in his earlier hospitalizations, Mr. Finley showed no allergies; that in 1963 Mr. Finley suffered a "mild pruritic erythematous rash" on his legs, attributed to the use of certain soaps. The Court does not believe that common knowledge and experience indicate that a physician who prescribed a common sleeping tablet to a patient with such a history was not following proper medical standards.

It necessarily follows, therefore, that Dr. Roitano's failure to check the plaintiff's medical records could not be found to constitute malpractice.

The complete record in this action appears to the Court to present a fact situation comparable to that considered by the Eighth Circuit Court of Appeals in Thompson v. Lillehei, 273 F.2d 376 (CA 8, 1959). Under Minnesota law, which controlled therein and appears to be basically the same as Ohio law, the court found sufficient evidence of proximate cause to make out a jury question on that issue, but held that the action must fail for the lack of expert evidence establishing a prima facie case of proof of proper medical standards and departure therefrom by the physicians involved.

The Court's sympathies are with this plaintiff. From the evidence it appears that the depigmentation has had a severe effect on his personality and life, and that he has had a difficult time adjusting thereto. It is, however, this Court's duty to apply the law to the evidence, and the Court finds that plaintiff has failed to sustain his burden of proof, by a preponderance of the evidence, that physicians employed by the Veterans Administration breached the standards of care and skill required of them under the circumstances set forth herein.

Judgment will be entered in favor of the defendant. This memorandum is adopted as Findings of Fact and Conclusions of Law, Rule 52, Federal Rules of Civil Procedure.